NOT DESIGNATED FOR PUBLICATION

Nos. 128,084
128,085

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of M.W. and R.V.,
Minor Children.


MEMORANDUM OPINION


Appeal from Douglas District Court; PAUL R. KLEPPER, judge pro tem. Submitted without oral argument. Opinion filed June 6, 2025. Affirmed.


*Danielle N. Davey*, of Sloan, Eisenbarth, Glassman, McEntire & Jarboe, LLC, of Lawrence, for appellant natural mother.


*Jon Simpson*, senior assistant district attorney, and *Suzanne Valdez*, district attorney, for appellee.


Before CLINE, P.J., COBLE and BOLTON FLEMING, JJ.


PER CURIAM:  The district court terminated the parental rights of Mother to her two children, M.W. (born in 2019) and R.V. (born in 2021). Mother appeals the district court's decision, arguing that the evidence presented to the district court was not sufficient to support its findings that she was unfit to parent the children and that her unfitness was likely to continue for the foreseeable future. She also contests the district court's conclusion that termination was in the children's best interests. After carefully reviewing the record and the parties' arguments, we affirm the district court's judgment.

1

*The Prior CINC Case on M.W.*

M.W. was born to Mother in 2019. In January 2020, the State petitioned to have M.W. adjudicated a child in need of care (CINC). The petition alleged that Mother—previously diagnosed with schizophrenia—had stopped taking her medications and was "unstable." The petition further alleged that when employees from the Kansas Department for Children and Families (DCF) visited Mother's home, they found it cluttered with choking hazards, dirty diapers, and what appeared to be vomit on the floor. DCF employees observed Mother acting erratically—mumbling, pointing at walls, and referencing objects without explanation. Mother was involuntarily hospitalized at Osawatomie State Hospital. M.W. was placed in custody of DCF for out-of-home placement in foster care.

The district court later adjudicated M.W. a child in need of care and approved a proposed permanency plan. This permanency plan required, among other things, that Mother meet weekly with her case manager, attend her medication appointments, and take her mental-health medication as prescribed.

In the following months, Mother progressed considerably. On November 16, 2020, M.W. returned to Mother's home, and several months later, the district court terminated DCF's custody over M.W. and ended the proceeding.

*The Current CINC Case*

In April 2021, Mother gave birth to R.V., the second child involved in these cases. About five months later, on September 15, 2021, the State petitioned to have both M.W. and R.V. adjudicated as children in need of care. The petitions alleged that Mother had been arrested for domestic battery one week earlier after striking her mother in the face,

pouring ammonia on her former stepbrother, and chasing him and another sibling from her apartment. Family members reported that Mother had stopped taking her medications about two weeks prior and was unstable.

The petitions also alleged that on September 13, 2021, a DCF employee attempted to speak with Mother over Zoom, who was incarcerated in the Douglas County Jail. But Mother, appearing on the Zoom call wearing only her underwear, refused to speak with the DCF employee and, at one point, began using the bathroom on camera. Jail staff reported that Mother had been "uncooperative and erratic" during her incarceration. On September 14, Mother refused to leave her cell and missed a scheduled court hearing in her criminal case, resulting in a court-ordered competency evaluation. On September 15, jail staff described Mother as "behaving very violently," not "medication compliant," and was a "'two-officer' inmate because of her dangerous and erratic state."

Mother was eventually released from the Douglas County Jail on October 12, 2021. In the meantime, the district court had ordered both M.W. and R.V. be placed in DCF custody for out-of-home placement in foster care.

On November 16, 2021, Mother appeared at a CINC adjudication hearing for M.W. and R.V. and entered a no-contest stipulation, agreeing that the children were in need of the State's care. The district court ordered custody of the children continue with DCF and the children were placed with the same foster parents who had previously cared for M.W. in the earlier CINC proceeding. The court found that reintegration was a viable goal and adopted the State's proposed permanency plan. This plan required Mother to submit to urinalysis tests, follow the recommendations laid out in a psychological evaluation, obtain stable housing and employment, and complete other tasks that would show Mother could care for the children. Kaw Valley Center (KVC) was to assist Mother in the completion of these tasks as a subcontractor of DCF.

Unfortunately, Mother did not complete many of these tasks. Most concerning was her refusal to take her prescribed medications, which led to a cascade of other case-plan failures: she consistently missed meetings with KVC staff that had been assigned to help her in her case, regularly failed to attend visits with the children, stopped participating in mental-health treatment, and was hospitalized and incarcerated multiple times.

In September 2023, about two years after these CINC cases were filed, the district court held a permanency hearing and found that reintegration with Mother was no longer a viable goal and changed the case-plan goal to adoption. The State moved to terminate Mother's parental rights about a month later, alleging Mother was unfit to parent the children under five statutory factors in K.S.A. 38-2269. The State also sought to terminate the parental rights of M.W. and R.V.'s natural fathers—though R.V.'s natural father was unknown.

The district court held a hearing to consider the State's motions to terminate parental rights in May 2024. During the hearing, the State admitted multiple reports from KVC into evidence that detailed Mother's lack of progress towards her case-plan tasks over the last two years. The State also called Nicole Alvarez, Mother's KVC case manager and support worker, to testify. Alvarez testified that Mother's mental health was always the central concern throughout the case and her failure to take her medications led to a persistent lack of stability and consistency. Mother routinely missed scheduled visits with the children; her last visit occurred in February 2023—over a year before the termination hearing. And Mother's attendance at case-plan meetings with Alvarez had been "sporadic at best." She was often unresponsive to phone calls, texts, and emails, and, over the course of the case, Mother had been repeatedly incarcerated and hospitalized. Alvarez also stated she had received several voicemails from Mother that she described as "concerning" and "threatening."

When meetings did occur, Alvarez testified, Mother frequently behaved erratically—speaking in loops, crying, removing items from her bag and misidentifying them, and continuing to talk as if another person were present even after being left alone in the room. Alvarez noted that Mother often confused past and present events, speaking about incidents from years ago as though they had occurred recently. At one meeting in January 2024, Alvarez was forced to call law enforcement to escort Mother from the building due to her irrational behavior.

Alvarez testified she was most concerned with Mother's inability to take her medications as prescribed or consistently attend her mental-health treatments. Moreover, even when Mother had scheduled appointments to address these needs, she would be subsequently incarcerated or hospitalized, which would "completely derail her." The State presented evidence that Mother had been incarcerated at the Douglas County Jail on 10 separate occasions over several years, totaling 270 days—three times in 2022, twice in 2023, and three times in 2024 (including twice in April 2024 alone).

The State also called M.W. and R.V.'s foster mother as a witness. The children's foster mother testified that, during the first CINC case, she had been "very close" with Mother and was pleased with M.W.'s reintegration, noting that Mother had gone "above and beyond" the case-plan requirements—making "more effort than she was required to." Unfortunately, the foster mother testified that Mother's progress in these cases did not mirror that from the prior one. While she and Mother kept in contact after the end of the previous CINC case, the foster mother began struggling to get in touch with Mother around March 2021—about the time R.V. was born. The foster mother stated that because of the "decline in [Mother's] mental health," the last "normal" interaction the two had occurred in early 2021.

The foster mother ended contact with Mother several months later after a series of concerning events. Mother began sending texts and making late-night calls that the foster

mother was unable to understand. This pattern continued escalating until an incident in October 2021, when Mother placed a FaceTime call to the foster mother, who was in the car with the children. Mother appeared "fully nude" and "was worried . . . that somebody was trying to get her. [Mother] was showing clear signs of being manic." The foster mother pulled over, took the phone out of the children's view, and tried to calm Mother. But Mother could not be reasoned with and the foster mother became concerned for Mother's safety. The foster mother then called local law enforcement to perform a welfare check on Mother. The foster mother testified that she and Mother have not spoken since.

Mother also testified at the termination hearing. She acknowledged that she noticed a difference in her mood when she took her prescribed medications; when she did not take them, she would have difficulty controlling her anger and would lash out at those around her. She explained that disruptions to her routine could trigger "manic" episodes, which then caused her to steal things—at the time of the termination hearing she was on probation in Kansas City, Missouri, for stealing food from Walmart. Mother also discussed her history of self-harm, stating that she had recently cut herself, including while in jail.

Mother stated that although she had recently been living at a community shelter in Lawrence, she had since moved in with her cousin. She planned to rent a one-bedroom apartment when she had saved enough for the down payment. She also stated that she was currently receiving mental-health services, had refilled a prescription the week before, and had taken it daily since. But she clarified during cross-examination that she had only refilled the prescription for a medication that helped her sleep—not the medication prescribed to treat her schizoaffective disorder. And finally, Mother maintained that the first CINC case involving M.W. had nothing to do with her mental health.

6

After hearing all the evidence, the district court took the matter under advisement. About a month later, it announced its rulings, terminating the parental rights of Mother and of both children's natural fathers. As for Mother, the court found her unfit to parent under multiple provisions of K.S.A. 38-2269, citing her unreliable testimony and her failure to consistently take her medications as prescribed and attend mental-health treatments, which led to "erratic, inconsistent, and concerning" behavior. Despite "commendable and extensive" efforts by KVC, Mother made no meaningful progress on her case plan, routinely missed visits and meetings, and often went months without contact with KVC staff. After more than two-and-a-half years, the court concluded Mother had not made demonstrable progress toward reintegration. Thus, it found the State had shown Mother's unfitness to care for the children by clear and convincing evidence and that this unfitness was likely to continue for the foreseeable future. The court further found that the children's best interests were served by terminating Mother's parental rights.

Mother appeals.

ANALYSIS

*The District Court's Finding that Mother Was Unfit Was Supported by Clear and Convincing Evidence*

*Standard of Review*

A parent has a constitutionally protected liberty interest in the relationship with his or her children. *Santosky v. Kramer*, 455 U.S. 745, 753, 758-59, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re B.D.-Y.*, 286 Kan. 686, 697-98, 187 P.3d 594 (2008). When a child has been adjudicated a child in need of care under K.S.A. 38-2202(d), the district court may terminate parental rights "when the court finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the

7

parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." K.S.A. 38-2269(a).

When reviewing a finding of parental unfitness, this court must determine, after considering all the evidence in a light favoring the State, whether the evidence was sufficient to support the court's decision. This court determines whether a rational fact-finder could have found it highly probable that the parent was unfit, i.e., whether the district court's findings are supported by clear and convincing evidence. *In re B.D.-Y.*, 286 Kan. 686, Syl. ¶ 4. We do not reweigh conflicting evidence, pass on the credibility of witnesses, or otherwise independently decide disputed questions of fact. 286 Kan. at 705.

DISCUSSION

*Present Unfitness*

Before terminating parental rights, a district court must determine whether a parent is unfit—that is, whether the parent engages in conduct or has a condition that renders him or her "unable to care properly for a child." K.S.A. 38-2269(a). To assess a person's fitness as a parent, the district court considers, among other things, the several factors listed in K.S.A. 38-2269(b) and (c). Depending on the facts and circumstances of each case, evidence of any of these factors can be enough to support a finding of parental unfitness. K.S.A. 38-2269(f).

The district court concluded that clear and convincing evidence showed that Mother was unfit to parent M.W. and R.V. at the time of the termination hearing under multiple subsections of K.S.A. 38-2269(b) and (c):

> "(b) In making a determination of unfitness the court shall consider, but is not limited to, the following, if applicable:

8

(1) Emotional illness, mental illness, mental deficiency or physical disability of the parent, of such duration or nature as to render the parent unable to care for the ongoing physical, mental and emotional needs of the child;

. . . .

(7) failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family;

. . . .

(9) whether, as a result of the actions or inactions attributable to the parent and one or more of the factors listed in subsection (c) apply, the child has been in the custody of the secretary and placed with neither parent for 15 of the most recent 22 months beginning 60 days after the date on which a child in the secretary's custody was removed from the child's home.

"(c) In addition to the foregoing, when a child is not in the physical custody of a parent, the court, shall consider, but is not limited to, the following:

. . . .

(2) failure to maintain regular visitation, contact or communication with the child or with the custodian of the child;

(3) failure to carry out a reasonable plan approved by the court directed toward the integration of the child into a parental home. " K.S.A. 38-2269(b), (c).

*K.S.A. 38-2269(b)(1)*

At the outset, we note that Mother does not contest the district court's finding of unfitness pursuant to K.S.A. 38-2269(b)(1) based on her mental health at the time of the hearing, thus waiving any objection to that ground. See *State v. Arnett*, 307 Kan. 648,

9

650, 413 P.3d 787 (2018) (issues not briefed are deemed waived or abandoned). That finding alone is sufficient to uphold the district court's present-unfitness determination, as evidence of any single statutory factor may support such a finding. K.S.A. 38-2269(f). Even so, the district court's decision on this point is supported by clear and convincing evidence that Mother's mental illness was of such duration *and* nature as to render her unable to care for the ongoing physical, mental, and emotional needs of the children. The record contains evidence of Mother's lengthy history with significant mental-health issues, including a diagnosis for schizoaffective disorder. The evidence at the termination hearing was that Mother was non-compliant in her treatment by failing to attend mental-health appointments and failing to take prescribed medication to address her mental-health issues. These failures directly impacted Mother's ability to care for her children. There is sufficient evidence to support the district court's finding that Mother was unfit at the time of the termination hearing pursuant to K.S.A. 38-2269(b)(1).

*K.S.A. 38-2269(b)(7)*

Mother argues there was insufficient evidence to support the district court's finding that there had been a failure to rehabilitate the family following reasonable efforts by KVC and affiliating organizations pursuant to K.S.A. 38-2269(b)(7). Mother identifies several areas in which she felt that Alvarez, her case-plan manager, had been lacking: helping Mother afford and obtain her prescription medications; helping Mother attend mental-health appointments; and helping Mother secure housing. Mother contends that Alvarez offered nothing more than "encouragement," which does not constitute reasonable efforts even "under the best circumstances."

We are unpersuaded. The reports submitted by KVC, corroborated by Alvarez's testimony, make clear that Mother's complaints were not the result of any failure by Alvarez, but from Mother's own inconsistent attendance and participation in case-plan meetings. Alvarez described the support she typically provides parents who are working

10

toward reintegration—such as printing housing applications, offering substance-abuse referrals, and sharing information about available treatments. But Alvarez could not offer such assistance to Mother because Mother frequently failed to attend meetings or, when she did, her mental health often rendered the conversation unproductive. Mother went months without contacting Alvarez, making it difficult for Alvarez to coordinate with Mother's mental-health providers or verify the information Mother provided regarding her housing and employment.

In light of this record, we find that there was evidence presented supporting the district court's finding that KVC provided reasonable efforts to reintegrate the family pursuant to K.S.A. 38-2269(b)(7).

*K.S.A. 38-2269(b)(9)*

The district court also found Mother was unfit pursuant to K.S.A. 38-2269(b)(9). There is sufficient evidence to support the district court's finding that at the time of the termination hearing, the children had been in the custody of DCF and placed with neither parent for 15 of the most recent 22 months, beginning 60 days after the date the children were removed from the home, as a result of the actions or inactions attributable to Mother. Mother's untreated and uncontrolled mental-health issues caused her to be hospitalized and incarcerated frequently. Mother also failed to gain meaningful employment or obtain appropriate housing for her and her children. Mother's actions and inactions directly resulted in her children being placed in state custody for an extended period of time. This subsection also requires that one or more of the factors listed in subsection (c) apply, and that burden is satisfied here as discussed below.

*K.S.A. 38-2269(c)(2)*

Mother also argues that there was insufficient evidence to support the district court's finding that she failed to maintain regular contact with her children under K.S.A. 38-2269(c)(2). Mother argues that her lack of visits with the children was out of her control and solely the result of Alvarez's decision. But after reviewing the record, we find sufficient evidence to support the district court's finding. At the time of the termination hearing, Mother had not visited with her children for over a year. Mother concedes that Alvarez had "difficulty" keeping in contact with her because her phone was often turned off or because she had been incarcerated or hospitalized. Although Alvarez did make the decision that visitations with the children would be inappropriate, she did so based on Mother's consistent failure to attend case-plan meetings and past visits. The district court's decision on this point is supported by sufficient evidence.

*K.S.A. 38-2269(c)(3)*

Mother also argues that there was insufficient evidence to support the district court's finding that she failed to carry out a reasonable plan towards reintegration under K.S.A. 38-2269(c)(3). She also argues that the State did not present evidence rebutting any of her testimony regarding her housing, employment, or participation in mental-health care.

Although Mother points out that there was testimony contrary to the district court's findings regarding her lack of stable housing, employment, and participation in mental-health care, she ignores the significant amount of evidence presented to support those findings. Alvarez testified that she could not verify that Mother had secured stable housing or maintained steady employment. Mother conceded at trial that she had recently lived in a shelter in Lawrence, was currently staying with a cousin, and hoped at some point in the future to obtain housing. At the time of the termination hearing, Mother had

no suitable housing for her children nor any workable plan to obtain suitable housing in the near future. There was also significant evidence that Mother had failed to attend mental-health appointments and failed to consistently take her prescribed medication. Mother did present testimony that she had refilled a prescription within the week of the hearing and had taken it every day since, but that medication was Trazadone—medication to help Mother sleep, not to alleviate the symptoms of her schizoaffective disorder. Thus, we find there is sufficient evidence in the record to support the district court's findings on these matters.

*Future Unfitness*

Mother next argues that the State presented insufficient evidence to prove that her unfitness as a parent would continue for the foreseeable future as required by K.S.A. 38-2269(a). She claims that "[t]he only evidence before the district court . . . was that Mother was receiving services [for her mental health] and was compliant with her medication."

A court can look to a parent's past conduct as a predictor of the foreseeable future. *In re M.S.*, 56 Kan. App. 2d 1247, 1264, 447 P.3d 994 (2019); *In re Price*, 7 Kan. App. 2d 477, 483, 644 P.2d 467 (1982). While past behavior is not always determinative of a person's future conduct, courts have recognized that sometimes a person's previous actions—or pattern of actions—can suggest how they will conduct themselves in the future. See *In re M.S.*, 56 Kan. App. 2d at 1264; *In re Price*, 7 Kan. App. 2d at 483.

At the time of the termination hearing, this case had been pending for over two-and-a-half years; Mother had not visited the children in over a year; she had "sporadic" attendance in case-plan meetings; consistently missed her mental-health treatment; and she presented no evidence that she was taking the medication prescribed to alleviate the symptoms of her schizoaffective disorder. Moreover, the State presented evidence that Mother had been incarcerated at the Douglas County Jail 10 separate times over the life

of the cases. Someone "cannot parent their children in any conventional sense while they are incarcerated. They are unable to provide a home and typically cannot offer meaningful financial or emotional support under those circumstances." *In re S.T.*, No. 121,376, 2019 WL 6795836, at *3 (Kan. App. 2019) (unpublished opinion).

The district court did not err when it found by clear and convincing evidence that Mother's unfitness was unlikely to change in the foreseeable future.

*Termination of Parental Rights Was in the Best Interests of the Children*

*Standard of Review*

After finding a parent unfit—both at the time of the hearing and for the foreseeable future—the district court must determine if termination of parental rights is "in the best interests of the child." K.S.A. 38-2269(g)(1). This assessment gives "primary consideration to the physical, mental and emotional health of the child." K.S.A. 38-2269(g)(1). We will only overturn a district court's best-interests determination when it constitutes an abuse of discretion. *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 2. A district court abuses its discretion if it rules in a way no reasonable person would have under the circumstances, ignores controlling facts or relies on unproven factual representations, or acts outside the appropriate legal framework. *State ex rel. Secretary of DCF v. Smith*, 306 Kan. 40, 60, 392 P.3d 68 (2017).

*Discussion*

Mother's final argument on appeal challenges the district court's finding that terminating her parental rights was in the best interests of M.W. and R.V. Mother points to testimony describing the "close bond" between her and M.W. and notes that her last supervised visit had gone well.

14

Once someone seeking termination has shown a person's parental unfitness by clear and convincing evidence, a district court has discretion to determine whether terminating parental rights is in the child's best interests. This assessment focuses on the child's physical, mental, and emotional health. K.S.A. 38-2269(g)(1). We defer to the district court's assessment, based on the district judge's observation of the witnesses and evidence-based judgment, as long as the district court does not abuse its discretion. *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 2.

No party disputes Mother's affection for her children and her desire to be united with them. But the district court did not abuse its discretion in concluding that the children's best interests weighed in favor of terminating Mother's rights. At the time of the hearing, M.W. and R.V. had spent the vast majority of their lives in foster care because of Mother's persistent mental-health challenges. Mother's last supervised visit occurred over a year prior to the termination hearing, and at that time, R.V. did not appear to know who Mother was. According to the record, the children referred to their foster parents as "Mom" and "Dad," and their foster mother testified that she could not recall a single instance in which either child mentioned Mother. Given how long this case had been pending with no positive change in Mother's mental health or completion of case-plan tasks, the district court did not err when it found that termination of Mother's parental rights was in the best interests of the children's physical, mental, and emotional health.

In light of the evidence presented at the hearing, the district court did not err when it terminated Mother's parental rights.

Affirmed.